FILED

08/05/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0096

DA 23-0096

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 168

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

HARLAN G. VASKA,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DC-21-170
Honorable Robert J. Whelan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Tammy A. Hinderman, Appellate Defender Division Administrator,
Joshua James Thornton, Assistant Appellate Defender, Helena,
Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Cori Losing, Assistant
Attorney General, Helena, Montana

          James A. Lapotka, Lake County Attorney, Polson, Montana

Submitted on Briefs:  March 26, 2025

Decided:  August 5, 2025

Filed:

                    _____
                             Clerk

Justice Katherine Bidegaray delivered the Opinion of the Court.

¶1 The Defendant, Harlan Gerald Vaska (Vaska) appeals the order of the Twentieth Judicial District Court, Lake County, denying his motion to dismiss on the grounds that the twenty-one-day time delay between his initial appearance and the filing of the information was reasonable.

¶2 We address the following restated issues:

1. *Whether the District Court abused its discretion by concluding that the twenty-one-day delay between the initial appearance and the probable cause determination was reasonable.*

2. *Whether the District Court erred by imposing continuous alcohol monitoring (SCRAM) as a parole condition.*

3. *Whether the District Court erred by imposing a $5,000 mandatory minimum fine under § 61-8-731(3), MCA (2019).*

We affirm in part, reverse in part, and remand with instructions.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Just after midnight on May 16, 2021, Lake County Sheriff's Deputy Brooke Livingston (Livingston) observed Vaska driving below the posted speed limit with tires drifting onto the shoulder of Light Road near Pablo, Montana. Vaska subsequently stopped his vehicle, and Livingston initiated an investigative stop. Livingston observed signs of intoxication, and Vaska admitted to drinking alcohol. Vaska performed part of the field sobriety tests before refusing further tests and a breath sample, ultimately providing a blood sample pursuant to a search warrant. The sample indicated a blood alcohol concentration of 0.195. Livingston cited Vaska with felony DUI.

2

¶4      At Vaska's initial appearance for his DUI charge on June 2, 2021, the Justice Court advised him of his rights; conditionally appointed counsel; notified him that his preliminary examination hearing was set for June 28, 2021; and released him on his own recognizance.  However, Vaska remained incarcerated because his DUI arrest was a probation violation on his sentence for a prior crime.  Lake County follows a local policy determining presumptive reasonableness of probable cause determinations for felony charges based on whether a defendant is incarcerated.  Under this policy, which is based on its understanding of §§ 46-10-105 and 46-11-203, MCA, Lake County considers it presumptively "within a reasonable time" to determine probable cause by filing an information or holding a preliminary examination hearing within ten days for defendants held on bond and within thirty days for defendants not detained specifically on the charged offense.  Consequently, on June 21, 2021, the State moved for leave to file an Information charging Vaska with DUI, fourth or subsequent offense, a felony, in violation of § 61-8-401 (2019), MCA;[1] on June 23, 2021, twenty-one days after Vaska's initial appearance, the District Court granted the State leave to file the Information, and the State filed the Information.

¶5      Vaska moved to dismiss for lack of speedy trial and untimely probable cause determination.  On February 3, 2022, Vaska pleaded not guilty.  On November 7, 2022, the District Court denied Vaska's motion to dismiss, finding the delays reasonable.  After a jury found Vaska guilty of felony DUI, the District Court committed him to the

---

[1] Repealed by Sec. 44, Ch. 498, L. 2021.

Department of Corrections for five years, none suspended; fined him $5,000 pursuant to § 61-8-731(3), MCA (2019)[2] (without considering his ability to pay the fine although it determined he was unable to pay the public defender fee or the trial expense fee incurred by the State); and required him to be fitted with a SCRAM bracelet if released within the five years. Vaska timely appeals, arguing the twenty-one-day delay between his initial appearance and the probable cause determination was not "within a reasonable time" as required by § 46-10-105, MCA, and abandoning his speedy trial claim.

**STANDARD OF REVIEW**

¶6 We review a district court's grant or denial of a criminal case, a question of law, de novo. *State v. Robison*, 2003 MT 198, ¶ 6, 317 Mont. 19, 75 P.3d 301; *State v. Haller*, 2013 MT 199, ¶ 5, 371 Mont. 86, 306 P.3d 338. We review a district court's "determination of 'reasonable time' pursuant to § 46-10-105, MCA, for abuse of discretion." *State v. McElderry,* 284 Mont. 365, 370, 944 P.2d 230, 233 (1997) (citing generally *State v. Higley*, 190 Mont. 412, 621 P.2d 1043 (1980) for the rule); *Robison*, ¶ 6; *Haller*, ¶ 5.

¶7 We review de novo criminal sentences for legality. *State v. Heath*, 2004 MT 126, ¶ 13, 321 Mont. 280, 90 P.3d 426; *State v. Gibbons*, 2024 MT 63, ¶ 20, 416 Mont. 1, 545 P.3d 686; *State v. Burch*, 2008 MT 118, ¶ 12, 342 Mont. 499, 182 P.3d 66. A claim that a criminal sentence violates a constitutional provision is also reviewed de novo. *Gibbons*, ¶ 20. The determination of the retroactivity of a rule created through previous

---

[2] Section 61-8-731(3), MCA (2019), was repealed in 2021 through Sec. 44, Ch. 498, L. 2021, and replaced by § 61-8-1008, MCA.

case law is a question of law that we review de novo.  *State v. Reichmand*, 2010 MT 228, ¶ 6, 358 Mont. 68, 243 P.3d 423.

**DISCUSSION**

¶8    *1. Whether the District Court abused its discretion by concluding that the twenty-one-day delay between the initial appearance and the probable cause determination was reasonable.*

¶9    Under Montana law, prosecution of a felony may be commenced by "an information following a preliminary examination or waiver of a preliminary examination";[3] "an information after leave of court has been granted";[4] or "an indictment upon a finding by a grand jury."[5]  Sections 46-11-101, -102, MCA; *see also* Mont. Const. art. II, § 20(1).  A prosecutor must use one of these three ways to establish probable cause to charge a felony.  Here, probable cause determined by indictment is not at issue because the Justice Court set a preliminary examination, prior to which the District Court granted the State leave to file an Information.

¶10    As to timing for a felony probable cause determination, other than by return of an indictment, § 46-10-105, MCA, requires a justice's court to hold a preliminary examination "within a reasonable time" after initial appearance unless "the defendant waives [it]";[6] or "the district court has granted leave to file an information."[7]  If the prosecutor chooses to apply directly to the district court for leave to file an information,

[3] Section 46-11-101(2), MCA.
[4] Section 46-11-101(3), MCA.
[5] Section 46-11-101(4), MCA.
[6] Section 46-10-105(1), MCA.
[7] Section 46-10-105(2), MCA.

5

the district court determines whether "there is probable cause to believe that an offense has been committed by the defendant" and "grants leave to file the information" if it finds probable cause. Section 46-11-201(2), MCA. If a justice's court finds probable cause after a preliminary examination or the district court grants the State leave to file an information after finding probable cause, "the prosecutor shall file within 30 days in the proper district court an information charging the defendant with the offense or any other offense supported by probable cause." Section 46-11-203(1), MCA. If the State does not file an information "within 30 days[,]" "the court shall dismiss the prosecution." Section 46-11-203(1)-(2), MCA.

¶11 Vaska argues the twenty-one-day delay between his initial appearance and the grant of leave to file the information was unreasonable; he asserts that Lake County should instead have determined probable cause to charge him within ten days because of his continued incarceration even if it was on an unrelated probation violation. The State argues the delay complied with local policy and federal guidelines permitting up to twenty-one days for defendants not detained specifically on the charged offense. "The determination of what constitutes a reasonable time pursuant to § 46-10-105, MCA, is within the discretion of the district court." *State v. Gatlin*, 2009 MT 348, ¶ 15, 353 Mont. 163, 219 P.3d 874. We have "held that no definite or 'trigger' deadlines are applicable in determining the reasonableness of the time taken to file an information." *Robison*, ¶ 10 (addressing the holding from *McElderry*). More specifically, we have found that a district court's "use of a ten-day deadline which automatically triggers an inquiry and places a burden upon the State to demonstrate reasonableness is not consistent with our holding in

6

*McElderry*" (*Robison*, ¶ 12); that a district court did not abuse its discretion in dismissing an information for an eleven-day delay (*Robison*, ¶ 15), a ten-day delay was reasonable (*Higley*, 190 Mont. at 420, 621 P.2d at 1048); and in *McElderry*, we stated that "a reasonableness inquiry must be 'determined by the facts of the case.'" *Robison*, ¶ 12, (citing *McElderry*, 284 Mont. at 370, 944 P.2d at 233). The factors identified in *Robison* for considering timeliness under § 46-10-105, MCA, include: "length of delay, reasons for delay, whether the defendant has been incarcerated or prejudiced, whether the defendant has counsel, the seriousness or complexity of the charge, and other relevant matters." *Robison*, ¶ 12.

¶12    Considering the timeliness factors suggested in *Robison*, the length of delay, twenty-one days, was less than the thirty days the State would have had under § 46-11-203(1), MCA, to file an information even if probable cause had been determined on the day of Vaska's initial appearance. The main reason for the delay is Lake County's policy to require prosecutors to file felony charges sooner for defendants who are detained than those who are not, a policy that reasonably considers both whether a defendant is incarcerated and the prejudicial impact of incarceration. Lake County's policy reasonably distinguished defendants based on custodial status. Lake County was consistent in applying its policy to Vaska because he remained incarcerated due to a probation violation in another case, not the DUI charge itself. Moreover, Vaska was provided counsel immediately at his initial appearance. Importantly, Vaska identified no specific prejudice resulting from the delay. Given these considerations, and consistent with *Robison* and

*McElderry,* we conclude the District Court did not abuse its discretion in finding the twenty-one-day delay reasonable. Thus, we affirm on this issue.

¶13     *2. Whether the District Court erred by imposing continuous alcohol monitoring (SCRAM) as a parole condition.*

¶14     District courts may impose parole conditions only if explicitly authorized by statute. *Burch*, ¶¶ 23-24. No statute, including § 46-18-201, MCA, and § 61-8-731, MCA (2019), authorizes a court to impose SCRAM monitoring as a parole condition in a DUI sentencing context. The State concedes the District Court lacked authority to impose this condition directly, and we agree. However, rather than striking the condition entirely, we remand to modify this parole condition into a recommendation to the Board of Pardons and Parole, consistent with our precedent in *State v. Heafner*, 2010 MT 87, ¶ 11, 356 Mont. 128, 231 P.3d 1087.

¶15     *3. Whether the District Court erred by imposing a $5,000 mandatory minimum fine under § 61-8-731(3), MCA (2019).*

¶16     Vaska challenges the $5,000 mandatory minimum fine imposed pursuant to § 61-8-731(3), MCA (2019), arguing it violates the Excessive Fines Clause (Mont. Const. art. II, § 22), as recently interpreted in *Gibbons*. Specifically, he argues that this Court correctly found, in *Gibbons*, that mandatory minimum fines are facially unconstitutional because such fines inherently preclude sentencing courts from considering an offender's financial ability to pay and consequently fail to meet constitutional proportionality requirements.

8

¶17 Since *Gibbons* was issued, the State has repeatedly sought to overturn it, asserting primarily the same arguments it advanced in *Gibbons*. As such, we begin our analysis mindful of the vital importance of stare decisis—a legal principle meaning to stand by things decided where courts generally adhere to previously decided cases when ruling on similar issues. "'Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'" *State v. Kirkbride*, 2008 MT 178, ¶ 13, 343 Mont. 409, 185 P.3d 340 (quoting *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991)). "It is of fundamental and central importance to the rule of law." *Kirkbride*, ¶ 13 (internal citation and quotation marks omitted). "[P]rinciples of law should be positively and definitively settled so that courts, lawyers, and, above all, citizens may have some assurance that important legal principles involving their highest interests shall not be changed from day to day." *State v. Wolf*, 2020 MT 24, ¶ 21, 398 Mont. 403, 457 P.3d 218 (citing *State ex rel. Sparling v. Hitsman*, 99 Mont. 521, 525, 44 P.2d 747, 749 (1935)). We have previously set the standard that a prior decision will be overturned only if it is manifestly wrong—a standard much higher than merely wrong. *Allstate v. Wagner-Ellsworth*, 2008 MT 240, ¶ 39, 344 Mont. 445, 188 P.3d 1042.[8]

---

[8] As Justice Rice has previously noted, quoting from *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 454, 135 S. Ct. 2401, 2408 (2015), "Respecting stare decisis means sticking to some wrong decisions." *Wolf*, ¶ 45 (Rice, J., concurring in part and dissenting in part). And, as aptly noted by Justice Shea, "sometimes stare decisis compels us to dance with the one who brung us, even if it means getting our toes stepped on a little." *Wolf,* ¶ 56 (Shea, J., concurring in part and dissenting in part).

¶18 The State fully presented its arguments in *Gibbons* and has repeatedly requested it be overturned since. The Dissent presents similar arguments, arguing that the Excessive Fines Clause standard should only consider gross disproportionality to the gravity of the offense, excluding consideration of the offender's financial circumstances. While we understand the State and the Dissent would prefer to overrule *Gibbons* and believe they have a better interpretation of the statute than the Court employs in *Gibbons* and today, they have failed to establish that *Gibbons* is manifestly wrong.

¶19 As such, we reject the State's invitation to overturn or narrow *Gibbons*. Our decision in *Gibbons* was carefully considered, thoroughly reasoned, and is not manifestly wrong. In reaching our holding, we explicitly examined and rejected the very arguments the State and the Dissent raise here, including the contention that mandatory minimum fines could be harmonized or upheld through as-applied analyses. We determined in *Gibbons* that through the enactment of § 46-18-231, MCA, the Legislature introduced a mandatory offender-proportionality analysis to be conducted by a court before imposing *any* fine, thus ensuring the offender had the ability to pay. Section 46-18-231, MCA, specifically requires that, when considering the amount of fine to impose, "the financial resources of the offender, and the nature of the burden that payment of the fine and interest will impose" must be considered. We concluded that the Legislature, through its enactment of § 46-18-231, MCA, effectuated state and federal constitutional protections against excessive fines and fees by codifying the inquiry that was to be made. *Gibbons* reflected a considered interpretation of Montana's Excessive Fines Clause and statutes,

10

consistent with both the language of Article II, Section 22, of the Montana Constitution and our long-standing constitutional tradition of individualized justice.

¶20 It is particularly notable that, in *Gibbons*, we engaged in comprehensive and deliberate analysis of Montana's Excessive Fines Clause, examining expansive precedent, constitutional text, historical context, and policy implications. *Gibbons,* ¶¶ 43-64. We considered extensive briefing on precisely the points the State and the Dissent now reassert. The Court carefully considered arguments that individualized assessments of a defendant's financial circumstances were unnecessary or inappropriate under our Excessive Fines Clause jurisprudence. After thorough deliberation, we concluded that Montana's constitutional tradition requires proportionality analysis to incorporate meaningful consideration of the defendant's ability to pay. Contrary to the assertion in the Dissent, *Gibbons* does not represent judicial overreach or departure from established principles. Rather, *Gibbons* reflects a careful and deliberate interpretation of the plain language and legislative purpose of § 46-18-231, MCA, and of Article II, Section 22, of the Montana Constitution. Nothing the State presents, or the Dissent articulates, demonstrates that our decision in *Gibbons* was manifestly wrong, demonstrably unworkable, or disregarded constitutional boundaries. Neither the State nor the Dissent present a "cogent reason" for departing from our considered judgment. To reconsider *Gibbons* now, absent a compelling justification beyond mere disagreement or political pressure, would undermine the principle of stare decisis.

¶21 Further, mandatory fines imposed without judicial discretion to consider individual circumstances fail to meaningfully protect public safety (§ 46-18-101(2)(b), MCA). When

11

fines are assessed against individuals who lack any realistic ability to pay, they fail to meaningfully enhance public safety, punish offenders commensurate with the harm caused, or promote rehabilitation. Instead, such fines often result in greater recidivism due to debt-related stressors and barriers to community reentry. *See generally*, Council of Economic Advisers, *Fines, Fees, and Bail: Payments in the Criminal Justice System that Disproportionately Impact the Poor* (December 2015).

¶22    Beyond issues relating to public safety, *Gibbons* acts as a safeguard against incarceration for lack of ability to pay a fine. The Dissent asserts that because the 2019 version of the statute allowed a sentencing judge to impose incarceration *or* fine, *or* both, § 61-8-731(3), MCA, was not facially unconstitutional, but rather was an as-applied challenge. Dissent, ¶ 36. We addressed this argument in *Gibbons* and rejected it, noting that a choice between paying a fine and incarceration is no choice for someone who is indigent and functions to incarcerate a person because they are poor. *Gibbons*, ¶ 61 ("Far from remedying the constitutional deficiency, as the State argues, this application of the ability-to-pay inquiry runs afoul of the basic prohibition against incarcerating an offender solely for his poverty.") (citations omitted).

¶23    Given that we decline to overturn *Gibbons*, it must retroactively apply to Vaska's case. Even-handed justice requires that new rules for the conduct of criminal prosecutions be applied retroactively to all cases pending on direct review or not yet final. *State v. Egelhoff*, 272 Mont. 114, 125-26, 900 P.2d 260, 267 (1995) (internal citations omitted). Because Vaska's case was still pending on direct appeal when *Gibbons* was decided, its holding applies to Vaska retroactively.

12

¶24 In this case, the District Court explicitly determined Vaska's inability to pay other monetary obligations (including fees for appointed counsel and trial expenses) yet imposed the mandatory minimum fine without assessing Vaska's financial circumstances. This inconsistency underscores precisely the unconstitutional and problematic nature of mandatory fines: they compel courts to impose penalties wholly divorced from reality and individual circumstance.

¶25 Accordingly, we reiterate clearly and unequivocally: we apply stare decisis and decline to overrule *Gibbons*. We reverse the $5,000 mandatory fine and remand for resentencing. On remand, the District Court shall reconsider imposition of a fine in accordance with the constitutional principles articulated herein and in *Gibbons*, explicitly evaluating Vaska's financial resources and ability to pay.

## CONCLUSION

¶26 We affirm the District Court's decision that the twenty-one-day delay in determining probable cause was reasonable. We reverse the District Court's imposition of the parole condition requiring continuous alcohol monitoring and remand for modification as a recommendation to the Board of Pardons and Parole. Finally, we reverse the imposition of the mandatory minimum $5,000 fine and remand for individualized reassessment in accordance with constitutional principles articulated in *State v. Gibbons*. On remand, the District Court shall explicitly evaluate Vaska's financial resources and ability to pay, imposing a fine only if it finds that doing so is consistent with the proportionality requirements clearly established in *Gibbons* and mandated by Montana's Excessive Fines Clause.

¶27 Affirmed in part, reversed in part, and remanded to the District Court for further proceedings consistent with this opinion.

/S/ KATHERINE M BIDEGARAY

We Concur:

/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON

Justice James Jeremiah Shea, specially concurring.

¶28 I join the Court's Opinion as to Issues 1 and 2. I specially concur with respect to Issue 3 because I continue to believe, as I stated in my Dissent in *Gibbons*, that this issue did not—and does not—need to be resolved on constitutional grounds. But I would like to start by pointing out that all seven Justices agree this matter must be remanded to the District Court to determine Vaska's ability to pay before any fine can be imposed. After sifting through all the Sturm and Drang, the dispute here boils down to just how much discretion the District Court does or does not have in assessing the fine after making that determination.

¶29 In my Dissent in *Gibbons*, I laid out my belief that the fine imposed by § 61-8-731(3), MCA (2019), could be harmonized with § 46-18-231, MCA's requirement that the district courts consider a defendant's ability to pay before imposing fines. *See Gibbons*, ¶¶ 68-77 (Shea, J., concurring in part and dissenting in part). That was, and continues to be, my preferred route to the conclusion reached by the Court's Opinion because it properly avoids the constitutional issues that are evident in the multiple opinions

14

issued in *Gibbons* and again in this case. *See Gibbons*, ¶ 78 (Shea, J., concurring in part and dissenting in part) (internal quote and citation omitted) ("Following our directive to avoid constitutional issues whenever possible, I would . . . decline to consider Gibbons's constitutional challenge to § 61-8-731, MCA."). A great deal of ink has now been spilled across two cases hashing out a constitutional issue I still believe can and should be avoided.[1]

¶30   But I ultimately specially concur because I also believe that stare decisis and constitutional avoidance counsel just as heavily against revisiting *Gibbons* in this case, as they did against diving into this constitutional melee in the first place. Overruling *Gibbons* in this case would require us to make yet *another* constitutional determination—this time that the constitutional reasoning of *Gibbons* was not only wrong, but manifestly wrong. And even though *Gibbons* was decided fairly recently, each time we kick up the constitutional dust we create a cloud of confusion for the citizens of Montana.

¶31   Sometimes getting a little dusty is necessary. But in my view this case illustrates the precise situation where it isn't. Mindful of our own admonition to "avoid constitutional issues whenever possible," *State v. Russell*, 2008 MT 417, ¶ 19, 347 Mont. 301, 198 P.3d 271, we should not lose sight of the practical ramifications of this constitutional dispute, specifically in the case before us. Every member of this Court agrees that the $5,000 fine the District Court imposed on Vaska should be vacated and the

---

[1] I recognize that I contributed to the multiple Opinions in *Gibbons* and the irony is not lost on me that I am lamenting that multitude in yet another separate Opinion in this case. But there are some situations where you have to be part of the problem to at least try to be part of the solution.

15

matter remanded for the District Court to determine Vaska's ability to pay. Assuming the District Court determines Vaska has the ability to pay—an assumption that is far from certain—the dispute here boils down to whether the District Court is *required* to impose a fine between $5,000 and $10,000, or whether it has the discretion to impose whatever fine it deems appropriate, but which could include a fine in the *exact same range*. And until the District Court has actually determined Vaska's ability to pay on remand—as we all agree it is required to do—these lofty debates of constitutional law and stare decisis are just theoretical disputes that will all be rendered moot if the District Court determines Vaska can't pay the fine anyway.

¶32     As in *Gibbons*, I continue to believe this matter can, and should, be resolved without wading into the constitutional issue. But notwithstanding my dissent in *Gibbons*, I am reluctant to revisit and potentially overturn a precedent of this Court in order to resolve a theoretical dispute over whether the District Court *can* or *must* fine Vaska $5,000 *if* it determines on remand that he has the ability to pay and which will be nothing more than an academic resolution if it decides he can't. As the Court so astutely observed, "sometimes stare decisis compels us to dance with the one who brung us, even if it means getting our toes stepped on a little." Opinion, ¶ 17, n. 8 (quoting *Wolf*, ¶ 56) (Shea, J., concurring and dissenting). True enough, but this is not the case that calls for starting a donnybrook on the dance floor over who's driving to the afterparty.

/S/ JAMES JEREMIAH SHEA

Chief Justice Cory J. Swanson, concurring and dissenting.

16

¶33    I join the Opinion on Issues 1 and 2, but dissent from the holding on Issue 3 that the $5,000 fine for a fifth offense DUI conviction is unconstitutional.  That holding relies upon *Gibbons*, which we must now recognize as manifestly wrong.  We should overrule *Gibbons*'s holding and correct our interpretation of the Montana constitutional guarantees against excessive fines before we inject any more confusion into our caselaw.

¶34    Overruling our prior precedent should never be taken lightly.  It is necessary on this occasion because *Gibbons* is manifestly wrong for five reasons: (1) it unnecessary reached a constitutional holding instead of resolving the case through statutory interpretation and harmonization; (2) the Excessive Fines Clause standard is gross disproportionality to the offense, not ability to pay; (3) Excessive Fine Clause challenges are appropriately as-applied and not facial; (4) it wrongly elevated § 46-18-231, MCA, to a constitutional status to strike down other statutes; and (5) the *Gibbons* holding is contrary to the United States Supreme Court and places this Court as an extreme outlier among all courts in America on Excessive Fines jurisprudence.

¶35    Along the way, *Gibbons* expressly or impliedly overruled six of our prior cases that had already addressed these issues in whole or in part, and it sped past rulings on statutory grounds or as-applied constitutional challenges to unnecessarily and wrongly strike down a statute as facially unconstitutional.  As such, our adherence to stare decisis and sound jurisprudence requires us to recognize *Gibbons* must be overruled.

**1. *Gibbons* should have been resolved by statutory interpretation and should not have even reached the constitutional issue.**

¶36     *Gibbons* addressed a fifth or subsequent offense DUI conviction, under the same statute at issue in this case.  The 2019 statute stated if a person was convicted for his fifth DUI after having been previously sentenced to an in-custody treatment program, "the person shall be sentenced . . . for a term not less than 13 months or more than 5 years *or* be fined an amount of not less than $5,000 or more than $10,000 *or* both."  Section 61-8-731(3), MCA (2019) (emphasis added).  The use of the conjunction "or" is significant because it grants the court discretion to impose a fine or a custodial sentence, or both.  The court could decide to omit a fine for a custodial sentence, or vice versa.

¶37     The fine has been routinely referred to as a "minimum mandatory" fine under this statute.  But the disjunctive "or" instead of "and" establishes a district court is not required to impose a fine.  If it does so, then the fine must be imposed in the range of $5,000 to $10,000.  It is not truly a minimum mandatory fine, then.  It is a discretionary fine, with a mandatory range of $5,000 to $10,000, if imposed.[1]

¶38     This understanding brings us to the application of § 46-18-231, MCA.  This law, originally enacted in 1981, provides judges discretion to impose a fine in some instances when a custodial sentence is inappropriate.  The "court may impose a fine, . . . in lieu of or

---

[1] Unlike a fifth or subsequent DUI, the fine for a fourth DUI (also a felony) is mandatory in the range of $5,000 to $10,000.  Section 61-8-731(1)(a)–(b), MCA (2019).  The Legislature has subsequently amended and reorganized the DUI statutes and now the fines for all DUI offenses, including fifth or subsequent, are mandatory.  *See* § 61-8-1009, MCA (2023).

18

in addition to a sentence of imprisonment." Section 46-18-231(1), MCA (1981). The statute conditioned the court's discretion in two ways.

¶39 First, for certain listed offenses, a court can only impose a fine in addition to, and not in lieu of, a sentence. These offenses include mitigated deliberate homicide, assault, kidnapping, sexual assault, and other serious offenses. Legislators expressed concern that wealthy individuals who committed these serious offenses might attempt to avoid prison time by paying a large fine, and this limitation was included to foreclose that possibility. Senate Judiciary Committee, Hr'g on S.B. 14 at 2–3 (January 13, 1981); House Judiciary Committee, Hr'g on S.B. 14 at 1 (March 10, 1981).

¶40 Second, the Legislature conditioned the court's discretion on subsection (3), which stated:

> The court may not sentence a defendant to pay a fine unless the defendant is or will be able to pay the fine. In determining the amount and method of payment, the court shall take into account the nature of the crime committed, the financial resources of the defendant, and the nature of the burden that payment of the fines will impose.

Section 46-18-231(3), MCA (1981). The operative text remained the same over the years, except modernizing updates have changed "defendant" to "offender" and added ability to pay the fine and interest. Section 46-18-231(3), MCA (2023).

¶41 We previously held in *State v. Mingus*, this statute applies only to discretionary fines, not to mandatory fines such as DUI convictions. *State v. Mingus*, 2004 MT 24, ¶¶ 14-15, 319 Mont. 349, 84 P.3d 658 "When a fine is statutorily mandated, the court has no discretion as to whether to impose the fine, irrespective of the defendant's ability to pay." *Mingus*, ¶ 15.

19

¶42 Justice Shea's concurrence in *Gibbons* correctly interpreted the fine and the ability to pay statute to avoid the constitutional holding striking down the DUI fine. *Gibbons*, ¶ 68 (Shea, J., concurring). He noted the text of § 61-8-731(3), MCA (2019), grants the court discretion to impose a fine and not impose a custodial sentence. *Gibbons*, ¶ 73 (Shea, J., concurring). When exercising that discretion to impose the fine, the judge must fulfill his or her § 46-18-231(3), MCA, obligation to consider the defendant's ability to pay and the gravity of the offense. And if the judge decided to impose a fine, the fine was required to fall within the statutory range of $5,000 to $10,000. Finding no record the judge conducted such an ability to pay analysis in *Gibbons*, Justice Shea recommended remanding the case back to the district court to analyze the ability to pay before deciding to impose the fine. *Gibbons*, ¶ 78.

¶43 Surprisingly, the *Gibbons* Court did not take this off-ramp to correctly construe the two laws together and avoid a constitutional holding striking down a statute. Indeed, three years previously, Justice McKinnon, the author of *Gibbons*, made nearly the identical argument in her dissent in *State v. Yeaton*, 2021 MT 312, 406 Mont. 465, 500 P.3d 583. "I see no logical construction of § 61-8-731(3), MCA (2019), supporting the contention that the fine was mandatory. I would conclude the fine imposed on Yeaton was discretionary." *Yeaton*, ¶ 36 (McKinnon, J., dissenting). Justice McKinnon then stated the district court was required to conduct the ability to pay analysis under § 46-18-231(3), MCA. *Yeaton*, ¶ 37 (McKinnon, J., dissenting).

¶44 As Justice Shea noted, *Gibbons* should not have created an overbroad constitutional holding. The statute in *Gibbons* was not a mandatory minimum fine, because the

20

conjunction "or" gave a judge the discretion to not impose the fine.  The *Gibbons* Court declared mandatory minimums unconstitutional when addressing a statute which was not a mandatory minimum.  Similarly here, the fine imposed upon Vaska was not a mandatory minimum fine, because the court had the authority to not impose a fine.

¶45    Here, the District Court concluded Vaska was unable to pay the OPD fee and various trial fees.  However, the court did not determine if Vaska was able to pay the $5,000 fine. Because under § 61-8-731(3), MCA (2019), the court is authorized to *not* impose a fine, the imposition of the $5,000 fine was discretionary.  This case should be remanded to the District Court to evaluate Vaska's ability to pay under § 48-16-231(3), MCA.

**2. The standard for the Excessive Fines Clause is gross disproportionality to the offense, not the offender's ability to pay.**

¶46    The Excessive Fines Clause can trace its roots all the way back to the 12th century and the Charter of Liberties of Henry I.  *Timbs v. Indiana*, 586 U.S. 146, 160, 139 S. Ct. 682, 693 (2019) (Thomas, J., concurring in judgement).  Considered the predecessor of the Magna Carta, King Henry I issued the Charter of Liberties upon his ascension to the throne in 1100, in which he promised his barons and men "shall only make amends according to the extent of the crime" they committed.  Albert Beebe White & Wallce Notestein, *Source Problems in English History* 369 (1915).  Punishment was proportional to the crime.

¶47    More than a century later, following a rebellion against King John, the Magna Carta was signed in 1215.  The Magna Carta reiterated what was promised in the Charter of Liberties.  It protected Earls, Barons, and the Church as against amercements[2] except in the

---

[2] See *Timbs*, 586 U.S. at 151, n.2, 139 S. Ct. at 688 n.2, regarding amercements and fines.

"quantity of [their] offence." 1 Eng. Stat. at Large 5, § 14 (1225). The Magna Carta did pay some attention to the personal circumstances of the offender, as it specifically prohibited the taking of items necessary for the person to practice his trade (such as taking a serf's plow). 1 Eng. Stat. at Large 5, § 14 (1225) ("villain . . . shall be likewise amerced, saving his wainage"). Such livelihood-destroying seizure would increase the magnitude of the fine through its collateral consequences. The English Bill of Rights subsequently declared "That excessive Bail ought not be required, nor excessive Fines imposed; nor cruel and unusual Punishments inflicted." 3 Eng. Stat. at Large 441, § 10 (1689). It "reaffirmed Magna Carta's guarantee" after the abusive Stuart kings were overthrown in the Glorious Revolution. *Timbs,* 586 U.S. at 152, 139 S. Ct. at 688.

¶48 The Virginia Declaration of Rights, largely considered the predecessor of the Bill of Rights, adopted these words verbatim: "excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 266, 109 S. Ct. 2909, 2915 (1989) (quoting *Solem v. Helm*, 463 U.S. 277, 285 n.10, 103 S. Ct. 3001, 3007 n.10 (1983)). And that language became the Eighth Amendment: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

¶49 The United States Supreme Court "has had little occasion to interpret, and has never actually applied, the Excessive Fines Clause" until *United States v. Bajakajian*, 524 U.S. 321, 327, 118 S. Ct. 2028, 2033 (1998). There, "Bajakajian attempted to leave the United States without reporting, as required by federal law, that he was transporting more than

22

$ 10,000 in currency." *Bajakajian*, 524 U.S. at 324, 118 S. Ct. at 2031. The statute provided for the forfeiture of the entire property, $357,114. *Bajakajian*, 524 U.S. at 325, 118 S. Ct. at 2032. The Supreme Court held "full forfeiture of [Bajakajian's] currency would be grossly disproportional to the gravity of his offense." *Bajakajian*, 524 U.S. at 324, 118 S. Ct. at 2031. In determining the standard for excessiveness of a fine, the Court first looked to the Magna Carta, English Bill of Rights, dictionaries from the founding era, and the history of the clause, concluding, "None of these sources suggests how disproportional to the gravity of an offense a fine must be in order to be deemed constitutionally excessive." *Bajakajian*, 524 U.S. at 336, 118 S. Ct. at 2037. Ultimately, the Court adopted the Cruel and Unusual Punishment test, "hold[ing] that a punitive forfeiture violates the Excessive Fines Clause if it is *grossly* disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334, 118 S. Ct. at 2036 (emphasis added). The Court reasoned gross disproportionality is necessary because "judgments about the appropriate punishment for an offense belong in the first instance to the legislature" as "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise." *Bajakajian*, 524 U.S. at 336, 118 S. Ct. at 2037 (citation omitted). The Court then classified Bajakajian's offense as a "reporting offense"[3] and determined the fine "bears no articulable correlation to any injury suffered by the Government." *Bajakajian*, 524 U.S. at 340, 118 S. Ct. at 2039.

---

[3] The federal district court found "the funds were not connected to any other crime and [Bajakajian] was transporting the money to repay a lawful debt." *Bajakajian* 524 U.S. at 326, 118 S. Ct. at 2032.

¶50	The United States Supreme Court officially incorporated the Excessive Fines Clause against the states via the Fourteenth Amendment in *Timbs*, 586 U.S. at 150, 139 S. Ct. at 687. While the Court outlined the history of the Excessive Fines Clause to conclude the clause was "fundamental to our scheme of ordered liberty, with dee[p] root[s] in [our] history and tradition," the Court did not address how to determine proportionality. *Timbs*, 586 U.S. at 149, 139 S. Ct. at 686–87; *see also State v. Timbs*, 169 N.E.3d 361, 366 (Ind. 2021) (On remand, Indiana Supreme Court highlighted how the *Timbs* opinion "did not spell out how courts should determine whether an *in rem* fine is excessive.").

¶51	*Timbs* did not change our caselaw on the test for excessiveness of a fine. Montana enacted its first Excessive Fines Clause in the 1889 Constitution. It was identical to the Eight Amendment. Mont. Const. of 1889 art. III, § 20 ("Excessive bail shall not be required, or excessive fines imposed, or cruel and unusual punishments inflicted."). It remained the same in the 1972 Constitution. Mont. Const. art. II § 22. As both the Montana and federal Excessive Fines clauses are identical in language, we interpreted them in the same way. *State v. Good*, 2004 MT 296, ¶ 20, 323 Mont. 378, 100 P.3d 644, *overruled on other grounds in State v. Johnson*, 2018 MT 277, 393 Mont. 320, 430 P.3d 494.

¶52	In *Good*, we looked to *Bajakajian* to determine "a restitution award 'violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense.'" *Good*, ¶ 23, (quoting *Bajakajian*, 524 U.S. at 334, 118 S. Ct. at 2036) (overruled in *Johnson*, where we held restitution was not a fine). We also noted we "first

24

turn to the legislature's determination as to what constitutes an appropriate punishment." *Good*, ¶ 23, (citing *Bajakajian*, 524 U.S. at 336, 118 S. Ct. at 2037).

¶53    In *State v. Tam Thanh Le*, we upheld a mandatory fine in drug cases calculated at 35% of the market value of the illegal drugs in the case. *State v. Tam Thanh Le*, 2017 MT 82, ¶ 15, 387 Mont. 224, 392 P.3d 607. We correctly held a fine or punitive assessment violates the Excessive Fine Provision of the Montana Constitution if it is "grossly disproportional to the gravity of a defendant's offense." *Le*, ¶ 15 (citing *Good*, ¶ 23, following the United States Supreme Court). We held the fine was not grossly disproportional to the offense. *Le*, ¶ 15.

¶54    In *Johnson*, we partially overruled *Good* on other grounds and concluded a restitution award is not a fine in the context of the excessive fines clause. *Johnson*, ¶ 26. In doing so, we once again reiterated a fine "violates the Excessive Fines Clause 'if it is grossly disproportionate to the gravity of a defendant's offense.'" *Johnson*, ¶ 26 (citation omitted).

¶55    Without any real constitutional analysis, *Gibbons* modified the Excessive Fines Clause standard and held, "the proportionality analysis required by the Montana and federal constitutions must include—not only a proportionality to the offense which the Legislature has determined when establishing the penalty for an offense—a proportionality *to the offender* as well." *Gibbons*, ¶ 56 (emphasis in original). The justification for this new standard is elusive. It certainly did not come from any federal or state constitutional scholarship. In fact, in the next sentence, the opinion expressly disclaims the necessity of relying upon the United States Supreme Court's holding in *Timbs*, but instead invokes the

25

Legislature's enactment of the ability-to-pay statute, § 46-18-231, MCA, and then claims this statute is "tethered" to the federal and state guarantee against excessive fines. *Gibbons*, ¶ 56. This analysis is flawed as explained below.

**3. Excessive Fines Clause claims are more appropriately considered as-applied and not as facial challenges to an entire statute.**

¶56 We began incorrectly applying the Excessive Fine Clause in facial challenges in *State v. Yang*, 2019 MT 266, 397 Mont. 486, 452 P.3d 897. Yang was a 52-year-old immigrant mother, who did not speak English, lived on $893 in social security and food stamp benefits, and was caught as a passenger in her ex-husband's car while he was transporting 144 pounds of marijuana from California to Minnesota.[4] *Yang*, ¶ 2. Yang claimed, likely truthfully, she did not know about the marijuana until after she departed California. *Yang*, ¶ 5. She pleaded guilty to possessing dangerous drugs, a felony. *Yang*, ¶ 4. The statute required a fine equal to 35% of the market value of the drugs; in her case, the court set the fine at $75,600. *Yang*, ¶ 6. In a parallel proceeding, her ex-husband received a fine of $4,000. *Yang*, ¶ 7.

¶57 However, Yang did not raise an Excessive Fines Clause challenge in the district court. It was an unfortunate oversight, because it meant her as-applied challenge was waived on appeal. *See State v. DeMarie*, 2025 MT 115, ¶ 26, 422 Mont. 208, 569 P.3d 602 (as-applied constitutional challenge is waived if not raised in the district court, facial challenge may be brought for the first time on appeal). Understandably sympathetic to

---

[4] At the time of publishing of *Yang*, California had legalized marijuana, Minnesota and Montana had not. Montana passed Initiative 190 less than a year later during the 2020 election, and Minnesota legalized marijuana in 2023.

26

Yang's plight, the Court prescribed a cure worse than the illness by unnecessarily striking down the 35% penalty statute as facially unconstitutional. It did so by sua sponte declaring § 46-18-231(3), MCA, the constitutional embodiment of the Excessive Fines Clause. The statute was not at issue in the case, and Yang did not address the statute on appeal. That did not stop the *Yang* Court from finding the ability-to-pay statute was the Legislature's implementation of the Excessive Fines Clause. *Yang*, ¶¶ 17–21. In words that would haunt us just a few years later, the *Yang* Court approvingly cited the mandatory minimum fine for felony DUI offenses, because the fine was necessarily capped at no more than $10,000, as a constitutionally acceptable fine, in contrast to the theoretically unlimited fine for the drug cases at issue. *Yang*, ¶ 23.

¶58    Justice Rice dissented, criticizing the court for striking down the statute as facially unconstitutional. Yang could not prove the fine would be excessive in all its applications, particularly where this Court had already held the 35% fine was constitutional in *Le*, only two years before *Yang*. As Justice Rice noted, "the inquiry should end there." *Yang*, ¶ 39 (Rice, J., dissenting). Justice Rice correctly noted the Court erred in finding the ability-to-pay statute "*embodies* the Eighth Amendment such that other statutes must conform to it to also be constitutional." *Yang*, ¶ 41 (Rice, J., dissenting) (emphasis in original).

¶59    Justice Baker's concurrence and dissent agreed with Justice Rice's and clarified Yang had clearly sought an as-applied challenge, not a facial challenge. *Yang*. ¶ 29 (Baker, J., concurring in part and dissenting in part). Justice Baker accurately noted the correct resolution of Yang's case would have been to grant plain error review and allow her to

27

present an as-applied challenge. *Yang*, ¶ 32 (Baker, J., concurring in part and dissenting in part). She may have prevailed because her fine was quite large and possibly grossly disproportionate to her level of criminality, like in *Bajakajian.*

¶60 But the *Yang* Court went beyond the correct resolution of the case, and well beyond the bounds of sound constitutional analysis, to strike down a criminal penalty law in all its applications. It did so despite its ink-barely-dry holding in *Le* that there was at least one case where the 35% penalty was constitutionally applied. Because the standard for excessive fines is whether they are grossly disproportional to the defendant's offense, they necessarily require case-specific inquiry. "[W]hether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case . . . ." *Yang*, ¶ 30 (Baker, J., concurring in part and dissenting in part) (quoting *Bajakajian*, 524 U.S. at 336 n.10, 118 S. Ct. at 2037 n.10). That requires the defendant to assert an as-applied constitutional challenge; the Court should decline opportunities to entertain facial challenges except in the most extreme circumstances, which were not present here.

**4. *Gibbons* impermissibly elevates § 46-18-231, MCA, to constitutional status.**

¶61 Federal and state caselaw prior to *Gibbons* correctly understood the Legislature has constitutional primacy to determine appropriate punishments and fines. *Good*, ¶ 23 (citing *Bajakajian*, 524 U.S. at 336, 118 S. Ct. at 2037). It necessarily follows that the Legislature's enactment of a mandatory minimum fine would not automatically be constitutionally suspect. The *Gibbons* Court got around that problem by following *Yang*

28

to elevate § 46-18-231(3), MCA, into a legislative codification and enactment of Excessive Fine Clause protections and grant subsection (3) constitutional status.

¶62 This maneuver permitted the *Gibbons* majority to create, out of thin air, a newly pronounced standard whereby to interpret not only the Montana, but also the United States Constitution's Excessive Fines Clause. Doing so permitted the Court to essentially declare all mandatory minimum fines unconstitutional. This claim lacks in legitimacy what it possesses in chutzpah.

¶63 The relevant text states:

> The sentencing judge may not sentence an offender to pay a fine unless the offender is or will be able to pay the fine and interest. In determining the amount and method of payment, the sentencing judge shall take into account the nature of the crime committed, the financial resources of the offender, and the nature of the burden that payment of the fine and interest will impose.

Section 46-18-231(3), MCA.

¶64 The *Gibbons* Court supplied the Legislature's intent in passing this law, calling it:

> an enlightened response to the increasing punitiveness in the American approach to criminal justice, an acknowledgment that imposition of mandatory fines on impoverished defendants are unlikely to reduce future crime, and a recognition that the impact of mandatory minimum fines is disproportionate on families of poor defendants and minority communities, particularly those of color.

*Gibbons*, ¶ 54. The opinion went on to explain how fines trap people in cycles of debt and incarceration. *Gibbons*, ¶ 55. "Mandatory minimum fines thus disproportionally impact minority communities and people of color." *Gibbons*, ¶ 55. The opinion states the fine impacts the offender's entire family, and its "symbiotic harm" greatly affects the women in the offender's family. *Gibbons*, ¶ 55.

29

¶65 All of that may or may not be true, but it was invented out of whole cloth for the purposes of the *Gibbons* opinion. The opinion did not cite to such information in the record, because the parties did not supply any, and the Legislature did not include any of this analysis or purpose in its legislative history. The members of the 1981 Montana Legislature would have been surprised to learn just how enlightened they were, when the Excessive Fines Clause, not to mention the symbiotic harm to the wives and mothers of people of color, was never mentioned a single time in the bill's passage.

¶66 In the Senate Judiciary Committee hearing, Mike Steven, a proponent of the bill on behalf of the Association of Counties, explained the bill gives judges flexibility and "saves the taxpayers money if a defendant were to pay a fine rather than go to jail." Senate Judiciary Committee, Hr'g on S.B. 14 at 2–3 (January 9, 1981). He pointed out "the cost to the county of keeping an individual in jail runs as high as sixteen to thirty dollars per day," and imposing a fine in lieu of a sentence "would realize some reimbursement for the crime from the fines levied." Senate Judiciary Committee, Hr'g on S.B. 14 at 3 (January 9, 1981). Senator Towe, the chief sponsor of the bill, highlighted how, for certain white-collar offenses, incarceration might not be a likely solution, so this statute gives the courts discretion to implement a fine in lieu of a sentence in those situations. House Judiciary Committee, Hr'g on S.B. 14 at 4 (March 6, 1981).

¶67 Additionally, during the hearings on the bill, critics raised concern over sexual assault being omitted from crimes which only allowed fines in addition to, and not in lieu of, the imprisonment. Senate Judiciary Committee, Hr'g on S.B. 14 at 2 (January 9, 1981). Legislators were worried this omission might result in defendants avoiding prison

sentences for sexual assaults by paying a fine. This concern was again raised as to other offenses, and modifications were made to include other offenses "against the body." Senate Judiciary Committee, Hr'g on S.B. 14 at 1 (January 13, 1981); House Judiciary Committee, Hr'g on S.B. 14 at 4 (March 6, 1981). The only discussion about the excessiveness of a fine was the decision to restrict a judge's ability to impose a fine over $50,000. House Judiciary Committee, Hr'g on S.B. 14 at 3 (March 6, 1981).

¶68 Representatives opposing the bill criticized its effect of increasing judicial discretion in sentencing and fines, highlighting the need for the primacy of the Legislature in these areas. House Judiciary Committee, Hr'g on S.B. 14 at 3 (March 10, 1981). Further, those Representatives, who ascribed to the "enlightened view" about helping the poor, actually labeled this bill as regressive. They argued it would allow wealthier defendants to pay fines and avoid jail, while disproportionately sending poor people to custodial punishment. House Judiciary Committee, Hr'g on S.B. 14 at 1 (March 10, 1981).

¶69 While we should not ascribe meaning to a statute based on the comments of a single legislator or proponent, the legislative history is informative in rejecting the *Gibbons* contention this statute was the embodiment of the Excessive Fines Clause. The legislative history does show one thing: the absolute and glaring *absence* of discussion of the Excessive Fines Clause. Nothing in the history of the statute suggests § 46-18-231, MCA, was intended to be the implementation of the Excessive Fines Clause. This is the proverbial dog that did not bark in the night.

¶70 *Gibbons* claims the ability-to-pay statute "codifies [ ] the proportionality analysis required by the Montana and federal constitutions," *Gibbons*, ¶ 56, without analyzing

31

whether these protections even needed legislative codification, because they don't. The Excessive Fines Clause is self-executing. *See City of Boerne v. Flores*, 521 U.S. 507, 524, 117 S. Ct. 2157, 2166 (1997) (superseded by statute) ("The first eight Amendments to the Constitution set forth self-executing prohibitions on governmental action, and this Court has had primary authority to interpret those prohibitions"). To determine whether the provision is self-executing, we ask whether the Constitution addresses the language to the courts or to the Legislature. If addressed to the Legislature, the provision is non-self-executing; if addressed to the courts, it is self-executing. *Columbia Falls Elementary Sch. Dist. No. 6 v. State*, 2005 MT 69, ¶ 16, 326 Mont. 304, 109 P.3d 257 (internal citations omitted).

¶71     The clause creates a floor, under which the state may not go. And the Court, not the Legislature, has primary interpretation authority in protecting those rights. The *Gibbons* Court surely did not mean to create the absurd result whereby the Legislature can amend the Montana (and federal?) Constitution by mere passage of a statute, and where the Legislature takes the front seat in interpreting these fundamental rights, displacing this Court. While the Legislature may exceed the protections granted by a constitutional provision, a statute cannot amend the meaning of a constitutional provision. "Although state and federal statutes may expand upon constitutional protections by creating new statutory rights, statutes do not alter the protections afforded by the Constitution itself." *Parents for Priv. v. Barr*, 949 F.3d 1210, 1232 (9th Cir. 2020). *See also* Mont. Const. art. XIV, §§ 8, 9 (methods of amending the Montana Constitution). As such, any statute, so far as it exceeds constitutional protections, must be interpreted alongside other

provisions in the Montana Code. *See generally* Title 1, chapter 2, part 1, MCA (provisions on statutory construction). The *Gibbons C*ourt's refusal to correctly interpret the ability-to-pay statute along with the mandatory fines for specific offense statutes, created a manifestly erroneous holding.

¶72 Moreover, the Excessive Fines Clause was dormant in 1981 because the United States Supreme Court, until *Bajakajian*, "had little occasion to interpret, and has never actually applied, the Excessive Fines Clause." *Bajakajian*, 524 U.S. at 327, 118 S. Ct. at 2033. It is neither logical nor historically accurate to conclude the Legislature had the foresight to implement a nearly forgotten constitutional clause first interpreted 17 years later by the United States Supreme Court in *Bajakajian*. Nor is it plausible that it included a factor, the ability to pay, which only began to be considered by certain state supreme courts decades after the *Bajakajian* opinion. And the Legislature did all this without mentioning the Excessive Fines Clause in its proceedings.

¶73 Finally, the statute's text does not support the *Gibbons* holding that it implemented the Excessive Fines Clause, yet only applied it piecemeal. The statute only applies to fines for felonies and misdemeanors, omitting administrative fines, civil penalties, or *in rem* forfeitures. *See Johnson v. Becerra*, 674 F. Supp. 3d 949, 955 (D. Mont. 2023) (The Ninth Circuit "has applied the Excessive Fines Clause in the context of civil penalties for 'trafficking' in food stamps, civil fines levied under the Agricultural Marketing Agreement

33

Act, and municipal parking fines.").[5] *Gibbons* creates a stricter proportionality standard for felony and misdemeanor fines, but maintains the gross disproportionality standard in non-criminal penalties and civil asset forfeitures. Applying a more deferential standard to civil penalties, where on at least some occasions the gravity of the offense is less than in criminal prosecutions, would create an absurd result.

¶74  *Gibbons* is the culmination of an error that began in *Yang*, striking down two different criminal fine statutes well beyond the requirements of each case or justification within our Constitution. This double strike is both staggering in its effect and unsettling in its methodology. The Court did not even analyze, let alone demonstrate, these two statutes were unconstitutional beyond a reasonable doubt. And the Court intentionally ignored all the constitutional jurisprudence and precedent available to reach its pre-ordained and manifestly wrong results.

¶75  The correct reading of the DUI fine and ability to pay statutes is as follows: Where a mandatory minimum fine is present, the fine is legal unless it is grossly disproportionate to the offense, and thereby violates the Excessive Fines Clause. If it is a discretionary fine, the judge must analyze the factors present in § 46-18-231(3), MCA. If there is a permissive fine of a specified range (as here and in *Gibbons*), the judge must make a finding as to ability to pay within the range mandated by the Legislature. If the defendant has the ability

---

[5] Examples within Montana law of civil penalties which, arguably, would not be covered by § 46-18-231, MCA, include: § 50-65-110, MCA, which imposes civil penalties on selling defective cigarettes, § 50-2-124, MCA, which imposes penalties on violations of rules imposed by local boards of health, or § 75-2-413, MCA, which provides for civil penalties in lieu of criminal penalties. Section 75-2-413, MCA, grants the Department of Environmental Quality the discretion to consider the ability to pay. *See* § 75-1-1001(2), MCA.

to pay within the range mandated by the Legislature, the judge may lawfully impose the fine. If the defendant cannot afford to pay within that range, the judge shall decline to impose it. That rule would properly harmonize the statutes and restore this Court's holding in *Mingus*.

**5. *Gibbons* is out of step with the United States Supreme Court, all federal courts, and every other state court. (That's everyone but us.)**

¶76    Since *Bajakajian*, federal circuit courts have adopted more specific tests for excessiveness of fines. Using different but similar factors, three different tests have emerged. The Second, Third, Fifth, Seventh, and D.C. Circuits, set forth these factors:

> (1) the essence of the crime of the defendant and its relation to other criminal activity; (2) whether the defendant fits into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct.

*United States v. Varrone*, 554 F.3d 327, 331 (2d Cir. 2009) (citation omitted; cleaned up); *see also United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010); *United States v. Suarez*, 966 F.3d 376, 385 (5th Cir. 2020); *United States v. Malewicka*, 664 F.3d 1099, 1104 (7th Cir. 2011); *United States v. Bikundi*, 926 F.3d 761, 795 (D.C. Cir. 2019) (D.C. Circuit omits "and its relation to other criminal activity" from the first factor.).

¶77    The Ninth, Fourth, and Sixth Circuits differ slightly in the test, looking to "(1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused." *United States v. 100,348.00 in United States Currency*, 354 F.3d 1110, 1122 (9th Cir. 2004) (citing *Bajakajian*, 524 U.S. at 337–40, 118 S. Ct. at 2038–39);

*see also United States v. Bennett*, 986 F.3d 389, 399 (4th Cir. 2021); *United States v. Bates*, 784 F. App'x 312, 341 (6th Cir. 2019) (Fourth and Sixth Circuits apply the same test as the Ninth Circuit, although the test structured differently). The Ninth Circuit has also specifically "decline[d] to incorporate a means-testing requirement for claims arising under the Excessive Fines Clause." *Pimentel v. City of Los Angeles*, 115 F.4th 1062, 1072 (9th Cir. 2024), *cert. denied sub nom. Los Angeles, CA v. Pimentel*, No. 24-1045, 2025 WL 1496501 (U.S. May 27, 2025).

¶78        Three different tests have also emerged in state courts after the United States Supreme Court incorporated the Eight Amendment against the states. Ohio, Indiana, and Washington have been the leaders, each employing a varying amount of deference to the state legislatures for their determination of proportionality. O'Hear, Michael M., *Our Anemic Excessive Fines Clause: Are State Courts Following the Federal Lead*, 60 Wake Forest L. Rev. (forthcoming) (manuscript at 15), https://perma.cc/RDJ2-CQXE [hereinafter O'Hear]. No state has gone so far as to declare all mandatory minimums unconstitutional.

¶79    Washington has been the most defendant friendly state.[6] In *City of Seattle v. Long*, 198 Wash. 2d 136, 493 P.3d 94 (2021), the Washington Supreme Court, applying the Ninth Circuit gross disproportionality test, included a fifth factor, the ability to pay. *Long*, ¶¶ 62,

---

[6] Colorado, a rival to Washington in this contest, has also adopted ability to pay analysis in *Colorado Dep't of Lab. & Emp. v. Dami Hosp., LLC*, 2019 CO 47M, ¶ 38, 442 P.3d 94. The Colorado case stated ability to pay is relevant in determining the severity of a penalty. Colorado still maintains mandatory minimum fines and sentences. *See, e.g.,* Colo. Rev. Stat. Ann. § 18-1.3-401(13)(a) (requiring the court to sentence a defendant to a midpoint of a presumptive range when the defendant knew the victim was pregnant).

72. Long was a homeless man living in his car, which was parked in a city-owned parking lot. *Long*, ¶ 2. After the car was parked for 72 hours, the city towed the car and imposed an impoundment fee of $547.12. *Long*, ¶ 4. Long challenged the fee under Washington's Homestead Act, Article I, § 7 of the Washington Constitution, and the Excessive Fines Clause. The Washington Supreme Court found the fine, *as-applied to* Long, violated the Homestead Act and the Excessive Fines Clause. *Long*, ¶¶ 80, 81 ("This decision is not intended to suggest that Seattle can never impound vehicles or impose costs associated with towing. Nor does it require city parking enforcement officers to determine a vehicle owner's ability to pay at the issuance of a parking infraction . . . .").

¶80    *Long* illustrates a unique case where a defendant's financial circumstance is relevant to gross disproportionality analysis, because Long's crime was directly caused by his financial circumstances. Long parked his car in the city parking lot because he was homeless, and was placed in "life circumstances over which [he had] little control and hence for which [he had] little culpability." O'Hear, at 26. Where the crime is directly caused by a defendant's poverty, and where it is an offense of little to no criminal culpability, then it may be grossly disproportional under *Bajakajian*, 524 U.S. at 340, 118 S. Ct. at 2039. *Long* does not easily translate from a (relatively) high fine imposed for a low-criminality offense of over-duration parking, to a repeat criminal conviction such as fifth and subsequent DUI conviction in *Gibbons* and this case. The *Gibbons* Court overreached when relying on *Long* in support of its ability to pay analysis. *Gibbons*, ¶ 49 n.1.

37

¶81 Despite an exhaustive search, I have been unable to find a single federal or state holding which has stricken a statute as facially unconstitutional under the Excessive Fines Clause.[7] This Court has now done it twice, both times unnecessarily and contrary to prior precedent. Despite claiming to follow the United States Supreme Court's interpretation of the Eighth Amendment's identical language as the Montana Constitution's protection against excessive fines, we have strayed mightily from that Court and every other American court that has considered this question. The Montana Supreme Court is now the *extreme outlier* on this issue.

**6. Stare Decisis**

¶82 Having determined *Yang* and *Gibbons* incorrectly interpreted the applicable statutes and pronounced an unsupportable constitutional standard at odds with every other court's reading of the Excessive Fines Clause, we must next consider whether the doctrine of stare decisis counsels continued acceptance of *Gibbons* and *Yang*.

¶83 Stare decisis plays an important role in our caselaw, serving many valuable ends. It protects the interests of those who have acted in reliance on a past decision. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991). It fosters evenhanded

---

[7] Relying on United States Supreme Court's *Apprendi* decision, as extended in *Alleyne v. United States*, Arizona's appellate court struck down under the Sixth Amendment right to jury trial—because the factual issue was determined by the judge—a mandatory minimum fine equal to "three times the value as determined by the court of the dangerous drugs involved in or giving rise to the charge." *State v. Angulo-Chavez*, 247 Ariz. 255, ¶ 11, 448 P.3d 296 (Ct. App. 2019); *see also Alleyne v. United States*, 570 U.S. 99, 112, 114–115, 133 S. Ct. 2151, 2160, 2162 (2013) (declaring mandatory sentence enhancement, which required judicial determination of a fact triggering a higher mandatory minimum, unconstitutional under Sixth Amendment's right to jury trial.). Arizona excised the portion calling for the judicial determination of the value, maintained the "three times the value of the drug" mandatory minimum, and found the defendant was not prejudiced by the judicial determination of the value of the drugs. *Angulo-Chavez*, ¶¶ 14, 16.

decision making by requiring that like cases be decided in a like manner. *State v. Spagnolo*, 2022 MT 228, ¶ 8, 410 Mont. 457, 520 P.3d 330. It "contributes to the actual and perceived integrity of the judicial process." *Spagnolo*, ¶ 8 (citation omitted). Stare decisis also provides a "way of accumulating and passing down the learning of past generations, a font of established wisdom richer than what can be found in any single judge or panel of judges." Neil Gorsuch, *A Republic, If You Can Keep It* 217 (2019).

¶84 However, "Court decisions are not sacrosanct, . . . and stare decisis is not a mechanical formula of adherence to the latest decision. Indeed, we have held that stare decisis does not require us to follow a manifestly wrong decision." *McDonald v. Jacobsen*, 2022 MT 160, ¶ 30, 409 Mont. 405, 515 P.3d 777 (quoting *State v. Gatts*, 279 Mont. 42, 51, 928 P.2d 114, 119 (1996)) (emphasis removed).

¶85 Many factors have been identified by this Court and the United States Supreme Court in past cases. These factors help determine if the dispute is one of differing interpretations, or if the prior opinion is one that is based on exceptionally weak grounds and must be overruled. The relevant considerations in this case are: (1) the type of right implicated in the error; *State v. Running Wolf*, 2020 MT 24, ¶ 22, 398 Mont. 403, 457 P.3d 218 (citation omitted); (2) the nature and quality of the precedent's reasoning; *McDonald*, ¶ 30 (citation omitted); (3) the individual or societal reliance interests in the precedent; *Lawrence v. Texas*, 539 U.S. 558, 577, 123 S. Ct. 2472, 2483, (2003); (4) the precedent's age, consistency with previous decisions, or reliance upon by subsequent decisions; and (5) the workability of the precedent; *Payne*, 501 U.S. at 827, 111 S. Ct. at 2609. All these factors counsel against the continuing validity of *Yang* and *Gibbons*.

**Type of Right Implicated in the Error**

¶86 The errors in our prior cases are both constitutional and matters of statutory interpretation. *Yang* incorrectly interpreted the ability-to-pay statute and therefore initiated a stream of flawed constitutional analysis. *Gibbons* showed the error will not be confined to a discrete set of cases or situations. Indeed, this flawed reasoning has wide-ranging implications. For an issue of statutory interpretation, the error must not be simply a dispute between two viable alternative statutory interpretations. Instead, the precedent must be based on an incorrect reading of the statute. In *Running Wolf*, we overruled our statutory interpretation where we concluded "the legislature could *not* have intended" the prior interpretation. *Running Wolf*, ¶ 23.

**Nature and Quality of Reasoning**

¶87 The nature and quality of the reasoning in *Yang* and *Gibbons* call for reversal. Both cases were a distinct departure from on-point prior holdings of the Court, and both relied upon fictional legislative intent and spurious constitutional analysis to reach their results. Their interpretation of § 46-18-231(3), MCA, is manifestly wrong. This argument is not a dispute between two viable alternate interpretations of statutory text. The *Gibbons* and *Yang* interpretation is simply not viable. The plain text of the statute shows the Legislature could not have intended the suggested interpretation. The legislative history shows the Legislature did not intend this interpretation of the statute. This interpretation has created bad law, and will continue to do so.

40

**Reliance**

¶88     There has been little reliance on *Gibbons* thus far. In this case, any reliance would not be upset. Any defendant sentenced without the DUI fine will not have it reimposed, and any fines imposed in the pre-*Gibbons* era are undisturbed. A defendant may still raise an as-applied Excessive Fines Clause challenge. In cases where the defendant has waived his or her challenge, we will consider plain error review if appropriate. Had the Court entertained such a challenge in *Yang*, this mess may have been avoided.

**Consistency with Prior Precedent**

¶89     As for consistency with prior precedent, *Yang* and *Gibbons* took a wrecking ball to this Court's previous holdings and interpretation of the issues. Together, they overruled, impliedly or expressly, all or parts of the following cases: *Mingus*, *Good*, *Johnson*, *Le*, *Yang*, and *Yeaton*. They unnecessarily struck down two statutes on the demonstrable fiction they could never be applied in a constitutional manner. And despite the Court's claim that we follow the United States Supreme Court on interpreting the Excessive Fines Clause, these two cases have taken this Court where all others fear to tread.

¶90     The Opinion chides this Dissent with a well-cited and well-reasoned admonition on the importance of following our precedent. Opinion, ¶¶ 17–18. I'm thrilled to see the Court has now found religion on the doctrine of stare decisis. It was notably lacking only a year ago when the *Gibbons* Court gave short shrift to the sanctity of our prior precedents without pausing to ponder the far-reaching consequences of its quantum leap in judicial law-making: "stare decisis is not an inexorable command . . . it is weakest when we interpret the Constitution . . . we place a high value on getting it right, because citizens

41

must live with a bad decision unless we correct our mistake . . . when governing decisions are badly reasoned or insufficiently reasoned, we are not constrained to follow precedent." *Gibbons*, ¶ 62 (citations and quotations omitted). Now having moved the Court to a newly-discovered constitutional interpretation (discovered by no one else), it defends the newly occupied terrain by raising the banner of STARE DECISIS and scolding anyone lamenting the jurisprudential casualties in our wake. I'm not convinced by these post-hoc rationalizations.

**Workability**

¶91 *Gibbons* and *Yang* are not workable as guiding lights to correctly understand and apply Excessive Fines Clause jurisprudence. Hundreds of sentencing hearings must now be redone after remand on appeal or other postconviction proceedings. The Court is now entertaining creative challenges to various even minimal mandatory fines or jail sentences. The courts will see litigation from defendants seeking to overturn their otherwise proportional fine because their sentencing did not involve an inquiry by a district court judge. Why? Because any statute slightly divergent from § 46-18-231(3), MCA, is unconstitutional under *Gibbons*.

¶92 And now we get to the real crux of the issue: what happens when the Legislature amends § 46-18-231, MCA, as it might? If it is the embodiment of the Excessive Fines Clause, and other statutes are unconstitutional because they do not follow its dictates, how do we respond if the Legislature changes it? Does the mandatory fine suddenly become constitutional again because the Legislature no longer requires an inquiry into ability to

pay? This conundrum exposes the truth that *Gibbons* and *Yang* are a constitutional edifice built upon sand.

¶93 I would overrule *Yang* and *Gibbons* consistent with this Dissent. I would hold under *Mingus* and *Yeaton* that the $5,000 to $10,000 fine for a felony DUI is not grossly disproportionate for an offense wherein the offender has been previously convicted of at least four prior DUI offenses and already sent to a custodial treatment program. And I would remand the case back to the District Court to determine whether Vaska has the ability to pay the discretionary fine for a fifth offense DUI under the 2019 statute, with the understanding that if the court imposes a fine, it must be in the mandatory range of $5,000 to $10,000.

/S/ CORY J. SWANSON

Justice Jim Rice joins the Concurrence and Dissent of Chief Justice Cory J. Swanson.

/S/ JIM RICE

Justice Beth Baker, dissenting in part.

¶94 I join the Court's Opinion on Issues 1 and 2. With respect to Issue 3, I do not join the Chief Justice's Dissent but am persuaded for several of the same reasons that our decision in *Gibbons* should be overruled. The State has not requested that we overrule *Yang*, however, and I accordingly would not do so. *Yang* is distinguishable on its facts and by the nature of the statute there considered.

43

¶95 I am a strong adherent to the doctrine of stare decisis, particularly in matters of statutory construction. *See, e.g.*, *City of Missoula v. Sadiku*, 2021 MT 295, ¶ 13, 406 Mont. 271, 498 P.3d 765; *State v. Spagnolo*, 2022 MT 228, ¶¶ 8, 15, 410 Mont. 457, 520 P.3d 330; *Est. of Woody v. Big Horn Cnty.*, 2016 MT 180, ¶ 20, 384 Mont. 185, 376 P.3d 127; *In re B.W.*, 2014 MT 27, ¶ 38, 373 Mont. 409, 318 P.3d 682 (Baker, J., dissenting); *State v. Stiffarm*, 2011 MT 9, ¶¶ 23-24, 359 Mont. 116, 250 P.3d 300 (Baker, J., dissenting). But that principle is not as compelling here. *Gibbons* has been the law for little more than a year, so reliance on the decision is not a big factor. *Compare Stiffarm*, ¶ 23 (Baker, J., dissenting) (noting thirty-year consistency in the Court's interpretation of statute at issue). More so, *Gibbons* overturned some twenty years of precedent. *See Gibbons*, ¶ 79 (Rice, J., dissenting).

¶96 The Court observes that the State "has repeatedly sought to overturn" *Gibbons*, "primarily" on the same arguments it advanced in that case. This is our first opportunity to consider those arguments. In my view, the State has brought additional light to the inquiry, as has the Chief Justice's Dissent, most notably in its historical examination of § 46-18-231, MCA, and the Excessive Fines Clause. Despite my reluctance to reexamine a case decided only a year ago (*see In re B.W.*, ¶ 38 (Baker, J., dissenting)), I am convinced that *Gibbons* was wrongly decided and that we should not perpetuate the error.

¶97 It continues to be my position, as I expressed in *Yang*, that a defendant in many cases will be able to challenge a mandatory fine on an as-applied basis. *See Yang*, ¶ 30 (Baker, J., dissenting) ("[W]hether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case[.]")

(quoting *Bajakajian*, 524 U.S. at 336 n.10, 118 S. Ct. at 2037 n.10). But I cannot agree that the statute Vaska challenges in this case is facially unconstitutional. As *Gibbons* compels a contrary conclusion, I would overrule it.

¶98 The conflict between § 46-18-231(3), MCA, and statutes mandating a minimum fine presents a matter of statutory interpretation. In this case, however, the 2019 statute under which Vaska was sentenced makes the imposition of a fine discretionary. *See* 61-8-731(3), MCA (2019) (providing that a person with Vaska's history—this being his tenth overall DUI and third felony DUI—"shall be sentenced to the department of corrections for a term of not less than 13 months or more than 5 years *or* be fined an amount of not less than $5,000 or more than $10,000, *or* both." [Emphasis added]). I therefore agree with the Chief Justice that the case should be remanded for consideration of the fine applying the 2019 statute under which Vaska was sentenced.

/S/ BETH BAKER